# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 03-CV-01793-EWB-BNB

PATRICIA EMERSON,

Plaintiff,

v.

WEMBLEY USA INC.;
WEMBLEY INC.;
ROBERT TY HOWARD in his personal capacity; and
JEFFREY GOERGEN in his personal capacity,

Defendants.

---

**PLAINTIFF'S RESPONSE TO WEMBLY INC.'S SECOND RENEWED MOTION FOR SUMMARY JUDGMENT AND WEMBLY USA INC.'S SECOND RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Plaintiff Patricia Emerson, through counsel Zupkus and Angell, P.C., and pursuant to F.R.C.P. 56, states the following in support of her Response To Wembley Inc.'s Second Renewed Motion For Summary Judgment And Wembley USA, Inc.'s (collectively referred to as "Wembley") Second Renewed Motion For Partial Summary Judgment ("Wembley Brief"):

## I. Introduction

### a. Response To Statement Of Undisputed Material Facts

The following set of facts was listed in the Wembley Brief and Plaintiff agrees with each:

1. Plaintiff agrees she was an employee of Defendant Wembley USA, Inc. ("WUSA") beginning approximately January 1999. *See* Deposition transcript of Pat Emerson, dated April 28, 2004, p. 9, lines 8-9, Wembley Brief **Exhibit A-1**.

2. Plaintiff agrees that WUSA is a wholly owned subsidiary of Wembley, Inc. ("WINC"). Plaintiff also agrees that the ultimate parent company of WINC is Wembley plc, a British company.

3. Plaintiff agrees she was hired as a controller in WUSA's accounting department. *See* Deposition transcript of Pat Emerson, dated April 28, 2004, p. 10, lines 17-18, Wembley Brief **Exhibit A-1**.

4. Plaintiff agrees that from 1999 until April 2001, she reported directly to WUSA Chief Financial Officer ("CFO"), David Brents. *See* Deposition of Pat Emerson, dated April 28, 2004, p. 10, lines 4-6, p. 12, lines 1-7, p. 13, lines 10-14, Wembley Brief **Exhibit A-1**. During this same period of time, the Plaintiff also reported to WUSA's President and CEO, Skip Sherman. *See* Deposition of Pat Emerson, dated April 28, 2004, p. 10, lines 4-6, p. 12, lines 1-7, p. 13, lines 15-19, Wembley Brief **Exhibit A-1**.

5. Plaintiff agrees that in April of 2001, both Mr. Brents and Mr. Sherman no longer had direct reports at WUSA and ultimately separated their employment from the company. *See* Howard Aff. ¶ 9, Wembley Brief **Exhibit A-3**.

6. Plaintiff agrees that after Mr. Sherman and Mr. Brents left the company and Mr. Howard took over as CEO, the Plaintiff reported to Mr. Howard. *See* Howard Aff. ¶ 4, Wembley Brief **Exhibit A-3.** Mr. Howard acted as the Plaintiff's supervisor until WUSA hired Defendant Goergen to serve as its CFO in October 2001. *See id.* at ¶10. From October 2001, until separation of Plaintiff's employment in December 2002, Defendant Georgen was the Plaintiff's immediate supervisor. *See id.* at ¶ 10; Deposition transcript of Pat Emerson, dated April 28, 2004, p. 198, line 19, Wembley Brief **Exhibit A-1**.

7. The Plaintiff agrees that effective December 31, 2001, Defendant Goergen was appointed as WUSA's CFO by its Board of Directors. *See* Howard Aff. ¶ 4, Wembley Brief **Exhibit A-3**. In September 2003, Defendant Goergen was appointed as WINC's CFO and treasurer. *See id.*

8. The Plaintiff agrees that on January 28, 2003, the Plaintiff filed a third Charge of Discrimination against WUSA with the EEOC alleging continuing retaliation for her complaints of gender discrimination. *See* 1/28/03 EEOC Charge, Wembley Brief **Exhibit A-10**. Plaintiff attaches a complete copy of

her EEOC Complaints hereto as **Exhibit B-32**. The Plaintiff's statements in support of this charge were made under oath. *See id.*

9. The Plaintiff agrees that on or about January 1, 1999, Mr. Brents provided the Plaintiff with a letter that stated, in pertinent part: "In the event that the Company chooses to terminate your employment for any reason, you will be entitled to payment of one year's full pay." *See* 1/9/99 Letter, Wembley Brief **Exhibit A-11**.

10. The Plaintiff agrees that neither WUSA nor WINC have paid the Plaintiff severance pay.

11. The Plaintiff agrees that for a period of time during her employment with WUSA, Plaintiff's job duties included performing financial functions for Lincoln Park. *See* Deposition transcript of Pat Emerson, dated April 28, 2004, p. 10, lines 10-11, p. 78, lines 17-22, Wembley Brief **Exhibit A-1**. Because of her responsibilities relating to Lincoln Park, the Plaintiff assisted in the grand jury investigation. *See* Deposition transcript of Pat Emerson, dated April 28, 2004, p. 72, lines 20-25, Wembley Brief **Exhibit A-1**; documents relating to Pat Emerson's grand jury testimony, attached hereto as **Exhibit B-2**. The Plaintiff also testified before the grand jury on February 13, 2002, pursuant to subpoena. *See* Subpoena, Wembley Brief **Exhibit A-13**;

documents relating to Pat Emerson's grand jury testimony, attached hereto as **Exhibit B-2**.

12. Plaintiff believes that Defendant Goergen's statements in the December 13 e-mail damaged her reputation. *See* Deposition transcript of Pat Emerson Vol. II, p. 306, lines 2-4, Wembley Brief **Exhibit A-16**.

13. Plaintiff agrees that she cannot identify a job she believes she would have gotten, but for the December 13 e-mail. *See* Deposition transcript of Pat Emerson Vol. II, p. 317, lines 17-21, Wembley Brief **Exhibit A-16**.

14. Plaintiff agrees that no one has told her that they think less of her because of the December 13 e-mail. *See* Deposition transcript of Pat Emerson Vol. II, p. 331, lines 17-21, Wembley Brief **Exhibit A-16**. Plaintiff agrees that no one has told her that they feel she is less competent than they thought before they saw the December 13 e-mail (*see id.* at p. 331, line 22; p. 332, line 17) or that they respect her less as a result of reading the December 13 e-mail. *See* Deposition transcript of Pat Emerson Vol. II, p. 332, lines 21-24, Wembley Brief **Exhibit A-16**.

15. Plaintiff agrees that no one has told the Plaintiff that they believe she was guilty of misconduct or anything like misconduct as a result of reading the

December 13 e-mail. *See* Deposition transcript of Pat Emerson Vol. II, p. 332, lines 21-24, Wembley Brief **Exhibit A-16**.

16. Plaintiff disputes all other facts listed as undisputed in the Wembley Brief.

**b. Statement of Additional Disputed Facts**

Plaintiff asserts that the following additional facts are disputed:

1. Plaintiff resigned her employment on December 16, 2002. *See* Deposition transcript of Pat Emerson, dated April 28, 2004, p. 42, lines 16-19, attached hereto as **Exhibit B-1**. Further, Plaintiff was forced to resign under the terms of a constructive discharge. *See* Deposition transcript of Pat Emerson, dated April 28, 2004, page 191, lines 24-25, p. 192, lines 1-5, Wembley Brief **Exhibit A-1**.

2. Defendant Howard was hired as CEO of WUSA and WINC in April 2001. For further clarification, Defendant Howard did not become an employee of WUSA or WINC until December 2003. *See* Robert Ty Howard's Deposition, taken April 30, 2004, p. 45, lines 3-14, attached hereto as **Exhibit B-3**. It is Plaintiff's position that she held the position of Acting CFO from April 2001 through October 2001. *See* Deposition transcript of Janet Meis, taken April 3, 2004, p. 10, lines 15-21, attached hereto as **Exhibit B-4**; Deposition transcript of Pat Emerson, taken April 28, 2004, p. 26, lines 10-12, attached hereto as

**Exhibit B-1**; documents relating to Pat Emerson as Acting CFO, attached hereto as **Exhibit B-5**.

3. It is Plaintiff's position that the performance evaluation, attached as Wembley Brief **Exhibit A-6**, constituted a negative evaluation. *See* Deposition transcript of Pat Emerson, taken April 28, 2004, p. 235, lines 8-12, attached hereto as **Exhibit B-1**.

4. Plaintiff filed an Equal Employment Opportunity Commission (EEOC") discrimination complaint, charging Defendants with gender discrimination, among other things, treating her less favorably than her male counterparts, which treatment resulted in adverse employment actions including lost opportunities for advancement and lost increases to her wages and benefits. *See* EEOC Complaint Wembley Brief **Exhibit A-7**; documents relating to Plaintiff's EEOC Complaints, attached hereto as **Exhibit B-32.**

5. WINC and WUSA have loaned or borrowed money from each other. Robert Ty Howard's Deposition, taken April 30, 2004, p. 143, lines 18-25, p. 144, line 1, attached as **Exhibit B-3**.

6. WUSA and WINC share the same Officers and Directors. *See* documents relating to Wembley subsidiaries and officers, attached hereto as **Exhibit B-6**.

7. WINC and WUSA share the same registered agents in Colorado and Delaware. *See* documents relating to Wembley subsidiaries and officers, attached hereto as **Exhibit B-6**.

8. Plaintiff performed tax services to WINC and assisted WINC in performing its primary function. *See* Wembley Brief, p. 2.

9. Plaintiff was an officer of WINC. *See* documents relating to Wembley subsidiaries and officers, attached hereto as **Exhibit B-6**.

10. In August of 2000, Plaintiff held a position in upper management and requested that Defendants Wembley provide her with a company car, which was a benefit Defendants Wembley provided to male managers at the same level as the Plaintiff. *See* documents relating to benefit of company car, attached hereto as **Exhibit B-7**; statement submitted with EEOC Complaint, dated October 25, 2001, attached as part of **Exhibit B-32**. The Plaintiff's requests were denied. *See* documents relating to benefit of company car, attached hereto as **Exhibit B-7;** statement submitted with EEOC Complaint, dated October 25, 2001, attached as part of **Exhibit B-32**. Plaintiff later discovered that Defendants Wembley continued to provide company cars to male employees at her management level. *See* documents relating to benefit of company car, attached hereto as **Exhibit B-7;** statement submitted with EEOC Complaint, dated October 25, 2001, attached as part of **Exhibit B-32**.

11. In November of 2000, Plaintiff discovered that Defendants Wembley would be hiring a Financial Director for the Lincoln Park office in Lincoln Park, Rhode Island. *See* Emerson Affidavit, attached hereto as **Exhibit B-8**.

12. In December of 2000, Plaintiff applied for the Financial Director position for the Lincoln Park office. *See* documents relating to Pat Emerson's application for Lincoln Park Financial Director position, attached hereto as **Exhibit B-9**.

13. In January of 2001, Plaintiff authored a memo directing no checks to be written to the law firm of McKinnon and Harwood. *See* memo regarding checks to McKinnon and Harwood, attached hereto as **Exhibit B-10**.

14. In April of 2001, the Plaintiff was appointed to the position of acting Chief Financial Officer ("CFO") for Defendants Wembley. *See* Deposition transcript of Janet Meis, taken April 3, 2004, p. 10, lines 15-21, attached hereto as **Exhibit B-4**; Deposition transcript of Pat Emerson, taken April 28, 2004, p. 26, lines 10-12, attached hereto as **Exhibit B-1**; documents relating to Pat Emerson as Acting CFO, attached hereto as **Exhibit B-5**.

15. Plaintiff was not provided with salary or benefits commensurate with the new position. *See* documents relating to Plaintiff's compensation, attached hereto as **Exhibit B-11**.

16. Defendants Wembley appointed Plaintiff to the position of Secretary of the Board of Directors. *See* documents relating to Wembley's subsidiaries and officers, attached hereto as **Exhibit B-6**.

17. Also in April of 2001, Plaintiff received a letter from Wembley plc and WUSA promising her that the company would indemnify Plaintiff for any sensitive information she provided it with respect to certain questionable expenditures, presumably made by Wembley CEO and CFO, Skip Sherman and David Brents. *See* April 12, 2001 letter to Pat Emerson, attached hereto as **Exhibit B-12**. Despite the indemnification agreement, Plaintiff was harassed and constructively discharged. *See* affidavit of Pat Emerson, attached hereto as **Exhibit B-8**.

18. In July of 2001, Plaintiff authored several e-mails questioning several accounting practices such as check cashing through the money room, internal control, and other accounting practices. *See* documents relating to questionable accounting practices, attached hereto as **Exhibit B-13**.

19. In August of 2001, Defendants Wembley hired a male for the Lincoln Park position, Mike Cardello, who had fewer qualifications for the position than the Plaintiff. *See* Emerson Resume, attached hereto as **Exhibit B-14**; Emerson Affidavit, attached hereto as **Exhibit B-8**.

20. In July and August of 2001, Plaintiff complained to Defendant Wembley that she was being mistreated because of her gender. *See* Deposition transcript of Pat Emerson, dated April 28, 2004, p. 82, lines 7-10, attached hereto as **Exhibit B-1**; documents relating to hostile work environment complaints, attached hereto as **Exhibit B-15**. The Plaintiff identified as a basis for gender discrimination the fact that Defendants Wembley did not consider her for the Lincoln Park position, as well as other incidents for which she received unfair treatment due to her gender. *See* documents relating to hostile work environment complaints, attached hereto as **Exhibit B-15**.

21. In August of 2001, Plaintiff discovered that Defendants Wembley posted her position on the Internet. *See* job posting, attached hereto as **Exhibit B-16**.

22. In October of 2001, Defendants Wembley hired Jeffrey Goergen to take over the Plaintiff's position as CFO. *See* Deposition transcript of Pat Emerson, dated April 28, 2004, p. 86, lines 13-15, attached hereto as **Exhibit B-1**. On October 25, 2001, Plaintiff filed an Equal Employment Opportunity Commission ("EEOC") discrimination complaint, charging Defendants Wembley with gender discrimination for, among other things, treating her less favorably than her male counterparts, which treatment resulted in adverse employment actions including lost opportunities for advancement and lost increases to her wages and benefits. *See* Wembley Brief **Exhibit A-7**;

documents relating to Plaintiff's EEOC Complaints, attached hereto as **Exhibit B-32**.

23. In response to the Plaintiff's EEOC complaint, Defendants Wembley reduced the Plaintiff's check-writing authority, and Defendants Wembley began to criticize the Plaintiff's job performance. *See* Deposition transcript of Pat Emerson, dated April 28, 2004, p. 144, lines 24-25, page 145, line 1, attached hereto as **Exhibit B-1**.

24. Beginning in December of 2001, in further retaliation to the Plaintiff filing a complaint with the EEOC as well as her internal complaints of gender discrimination, Defendants Wembley excluded the Plaintiff from all further board meetings. *See* documents relating to Plaintiff's participation in meetings and authority, attached hereto as **Exhibit B-17**.

25. As further retaliation, on or about January of 2002, Defendants Wembley stripped Plaintiff of her authority to approve all contracts and to approve purchases, which authority the Plaintiff had prior to making complaints of gender discrimination. *See* documents relating to Plaintiff's participation in meetings and authority, attached hereto as **Exhibit B-17**; deposition transcript of Pat Emerson, dated April 28, 2004, p. 140, lines 10-24, p. 144, lines 24-25, p. 145, line 1, attached hereto as **Exhibit B-1**.

26. On February 6, 2002, Plaintiff was subpoenaed to testify before a Rhode Island State grand jury proceeding investigating Defendants Wembleys' Rhode Island activities surrounding the implementation of Video Lottery Terminals. *See* Deposition transcript of Pat Emerson, dated April 28, 2004, p. 72, line 22, Wembley Brief **Exhibit A-1**, documents relating to the grand jury proceedings, attached hereto as **Exhibit B-2**. Immediately following her compelled testimony; Defendants Howard and Goergen began to mistreat the Plaintiff by ignoring her, criticizing her performance, criticizing her abilities in front of her subordinates, and perpetuating a hostile work environment. *See* documents relating to the grand jury proceedings, attached hereto as **Exhibit B-2**; deposition of Pat Emerson, dated April 28, 2004, p. 74, lines 9-17, attached hereto as **Exhibit B-1**.

27. In an e-mail sent from Defendant Goergen to the Plaintiff on February 15, 2002, Goergen acknowledges that the Plaintiff did "an outstanding job" until "these recent issues" referring to the grand jury proceedings. *See* e-mail from Goergen, dated February 15, 2002, attached hereto as **Exhibit B-18**.

28. Immediately upon Plaintiff's return from testifying in front of the Rhode Island grand jury, Defendant Goergen approached Plaintiff to discuss certain "issues" he had with Plaintiff never before raised. *See* e-mail from Goergen, dated February 15, 2002, attached hereto as **Exhibit B-18**.

29. After June 3, 2002, Defendants Wembley intentionally and falsely accused the Plaintiff of fraud and theft for the purposes of attempting to discredit the Plaintiff to her subordinates, peers, and to the EEOC. *See* documents relating to accusations of fraud and theft, attached hereto as **Exhibit B-19**.

30. Because of Defendants Wembleys' continued mistreatment in response to the Plaintiff's EEOC and internal complaints, Plaintiff filed a second EEOC claim for unlawful retaliation in June 2002. *See* Wembley Brief **Exhibit A-8**; documents relating to Plaintiff's EEOC Complaints, attached hereto as **Exhibit B-32**.

31. On June 4, 2002, Defendant Goergen advised only the women of the accounting department that excessive emotion, negativity, and insubordination would not longer be tolerated. *See* documents relating to accounting team meeting, attached hereto as **Exhibit B-20**.

32. On July 17, 2002, Plaintiff returned from approved vacation to find that Defendant Goergen advanced the deadline for a project upon which the Plaintiff was working, with the intent of reprimanding the Plaintiff for her inability to complete the project. *See* documents relating to Plaintiff's advanced deadlines, attached hereto as **Exhibit B-21**.

33. On July 24, 2002, Plaintiff requested a meeting with Defendant Goergen to discuss Defendants Wembley's hostile work environment. Plaintiff informed Defendant Goergen that constant and pervasive hostility and resentment directly affected her work. *See* documents relating to Plaintiff's request for meetings, attached hereto as **Exhibit B-22**.

34. Plaintiff relayed to Defendant Goergen that such hostile treatment was making her physically ill. *See* documents relating to Plaintiff's physical health, attached hereto as **Exhibit B-23**.

35. Defendant Goergen refused to meet with the Plaintiff but, instead, continued his hostile treatment of the Plaintiff. *See* documents relating to Plaintiff's physical health, attached hereto as **Exhibit B-23**.

36. As a result of Defendants Wembleys' continued barrage of belittlement, the Plaintiff inquired as to whether there was an employee assistance program as the hostile work environment resulted in emotional difficulties. *See* documents relating to Plaintiff's physical health, attached hereto as **Exhibit B-23**.

37. In an e-mail addressing Defendants Wembleys' false statements regarding fraudulent conduct, the Plaintiff again relayed to Defendants Wembley that these false allegations negatively impacted her and as a result she was

physically ill. *See* documents relating to Plaintiff's physical health, attached hereto as **Exhibit B-23**.

38. As a direct result of the hostile work environment and adverse employment actions perpetrated by Defendants Wembley, Plaintiff became emotionally distraught and took a medical leave of absence starting on August 8, 2002. *See* documents relating to Plaintiff's physical health, attached hereto as **Exhibit B-23**.

39. Plaintiff's doctor provided Defendants Wembley with information concerning the emotional symptoms suffered by the Plaintiff as a result of Defendants Wembleys' actions. *See* documents relating to Plaintiff's physical health, attached hereto as **Exhibit B-23.**

40. Defendants Wembley threatened the Plaintiff with termination unless she returned to work by September 12, 2002. *See* documents relating to Plaintiff's physical health, attached hereto as **Exhibit B-23**.

41. On September 5, 2002, after numerous communications with Defendants Wembley regarding her hostile work environment, the Plaintiff reflected to Defendant Goergen that his and Defendant Howard's silence, regarding the Plaintiff's request to address the conduct, implied the situation would not be

corrected. *See* documents relating to Plaintiff's request for a meeting, attached hereto as **Exhibit B-22**.

42. In October of 2002 and in retaliation for the Plaintiff's internal and EEOC complaints of discrimination and retaliation, Defendants Wembley excluded the Plaintiff from budget discussions. *See* documents relating to Plaintiff's participation in meetings and authority, attached hereto as **Exhibit B-17**; affidavit of Pat Emerson, attached hereto as **Exhibit B-8**.

43. Prior to Plaintiff's complaints regarding Defendant Wembleys' discriminatory practices, Plaintiff had regularly participated in budget discussions. *See* Emerson Affidavit, attached hereto as **Exhibit B-8**; deposition transcript of Pat Emerson, dated April 28, 2004, p. 10, lines 10-16, p. 99, lines 16-18, p. 175, lines 12-18, p. 180, lines 21-25, p. 181, lines 1-9, attached hereto as **Exhibit B-1**.

44. Defendants Wembley then stripped the Plaintiff of most of her job duties and supervisory responsibilities. *See* deposition transcript of Pat Emerson, dated April 28, 2004, p. 140, lines 23-24, attached hereto as **Exhibit B-1**; documents relating to Plaintiff's participation in meetings and authority, attached hereto as **Exhibit B-17**.

45. After being stripped of her duties, the Plaintiff's task was to place inventory identification tags on hundreds of items at various locations. *See* Deposition transcript of Pat Emerson, dated April 28, 2004, p. 144, lines 8-12, attached hereto as **Exhibit B-1**; documents pertaining to tagging inventory, attached hereto as **Exhibit B-24**. This limited task degraded the Plaintiff. *See* documents pertaining to tagging inventory, attached hereto as **Exhibit B-24**.

46. Plaintiff made repeated requests of Defendants Wembley for a job description and performance evaluation. *See* documents relating to Plaintiff's request for a job description and performance evaluation, attached hereto as **Exhibit B-25**. Finally on November 5, 2002, Defendants Wembley provided the Plaintiff with a formal written evaluation, which for the first time in almost ten years with Defendants Wembley, rated her very negatively. Defendants Wembley also threatened her with termination. *See* Wembley Brief **Exhibit A-6;** documents relating to Plaintiff's request for a job description and performance evaluation, attached hereto as **Exhibit B-25**.

47. Following the negative evaluation, on November 8, 2002, Plaintiff reported to Defendants Wembley that she continued to experience hostile treatment, as well as adverse employment conditions committed by Defendants Howard and Goergen. *See* documents relating to Plaintiff's request for a job description and performance evaluation, attached hereto as **Exhibit B-25**.

48. On or about December 13, 2002, Defendant Goergen sent an e-mail to the Plaintiff and over fifty (50) other individuals inside and outside the company. *See* **Exhibit A-15** Wembley Brief. The e-mail attacked the Plaintiff's mental capabilities and ability to perform her job stating, "Your version of reality frequently does not correspond to mine…" questioning the Plaintiff's mental capabilities. *See* **Exhibit A-15** Wembley Brief.

49. As a result of Defendant Goergen's December 13, 2002 e-mail, the Plaintiff was humiliated, emotionally distraught, embarrassed and stupefied to such great extent that she was forced to immediately resign under the terms of a constructive discharge. The Plaintiff had no other choice. *See* Deposition transcript of Pat Emerson, dated April 28, 2004, p. 147, line 1, attached hereto as **Exhibit B-1**; documents relating to Plaintiff's constructive discharge, attached hereto as **Exhibit B-26**.

50. On May 30, 2003, satisfied that the Plaintiff had been discriminated and retaliated against, the EEOC tendered a right to sue letter to the Plaintiff with regard to all of her EEOC charges. *See* Right To Sue letter, attached hereto as **Exhibit B-27**.

51. Although the Plaintiff worked for Defendants Wembley for ten (10) years, their actions forced her action…she was constructively discharged. *See*

documents relating to Plaintiff's constructive discharge, attached hereto as **Exhibit B-26.**

52. After the Plaintiff's employment with Wembley ceased, Wembley underwent a reorganization whereby Wembley USA, Inc. no longer owned the Lincoln Park operations. Instead, the Lincoln Park operations were transferred to Wembley, Inc. *See* affidavit of Pat Emerson, attached hereto as **Exhibit B-8**; documents relating to reorganization, attached hereto as **Exhibit B-33**.

53. Because of the reorganization, Wembley, Inc. most closely resembles the entity Plaintiff performed work for during her employment at Wembley. *See* affidavit of Pat Emerson, attached hereto as **Exhibit B-8**; documents relating to reorganization, attached hereto as **Exhibit B-33**. Plaintiff also performed work on behalf of Wembley USA, Inc. *See* affidavit of Pat Emerson, attached hereto as **Exhibit B-8**.

54. Dan Bucci was an officer and director of Wembley at the time Plaintiff worked for the companies. *See* documents relating to Wembleys' officers and subsidiaries, attached hereto as **Exhibit B-6**; Deposition of Dan Bucci, taken November 16, 2005, p. 10, lines 18-24, p. 11, lines 1-7, attached hereto as **Exhibit B-34.**

55. Plaintiff deposed Dan Bucci on November 16, 2005 in Rhode Island. At his deposition, Mr. Bucci pled the Fifth, Sixth and Fourteenth Amendment to the United States Constitution in response to the questions posed by Plaintiff. *See* Deposition of Dan Bucci, taken November 16, 2005, attached hereto as **Exhibit B-34.**

56. Mr. Bucci was asked whether he is familiar with the organization of Wembley USA Inc. and Wembley Inc. and whether he was aware that Defendants Wembley have the same registered agents in Colorado and Delaware. Mr. Bucci refused to answer. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 32, lines 1-8, attached hereto as **Exhibit B-34.** Mr. Bucci was also asked whether he was aware that all of Wembley Inc.'s officers and directors are the same as Wembley USA Inc.`s officers and directors. He also refused to answer this question. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 32, lines 9-16, attached hereto as **Exhibit B-34.**

57. Mr. Bucci was asked whether he was aware that after Plaintiff's employment with Defendants Wembley, the Wembley companies were reorganized. Mr. Bucci refused to answer. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 33, lines 4-11, attached hereto as **Exhibit B-34.** Mr. Bucci was asked whether he agrees that the assets and responsibilities once held by Wembley USA Inc. are now divided between Wembley Inc. and Wembley USA Inc. He refused to answer this question as well. *See* Deposition of Dan Bucci, taken

November 16, 2005, p. 32, lines 17-24, p. 33, lines 1-3, attached hereto as **Exhibit B-34.** Mr. Bucci was asked whether he was aware that Wembley Inc now owns Lincoln Park and that Wembley Inc. now most closely resembles the entities for which Plaintiff performed work during her employment. He refused to answer. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 33, lines 12-24, p. 34, lines 1-4, attached hereto as **Exhibit B-34.**

58. Mr. Bucci was asked to admit that he regularly worked with Plaintiff while Plaintiff was an employee of Wembley USA Inc. and Wembley Inc. Mr. Bucci refused to answer. *See* correspondence between Dan Bucci and Pat Emerson, attached hereto as **Exhibit B-28**.

59. Through his work with the Plaintiff, Mr. Bucci was able to form opinions of her work and has knowledge regarding Plaintiff's scope of work. *See* correspondence between Dan Bucci and Pat Emerson, attached hereto as **Exhibit B-28.**

60. Mr. Bucci was asked whether he was familiar with the dates of Plaintiff's employment and with Plaintiff's job duties at Wembley Inc. and Wembley USA Inc. and whether he was aware that Plaintiff prepared federal tax returns for Wembley Inc. and signed these returns as acting CFO. Mr. Bucci refused to answer. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 16, lines 11-21, p. 17, 1-14, attached hereto as **Exhibit B-34.** Mr. Bucci was also

asked whether he was aware that Plaintiff had authority to approve all contracts and purchases for Wembley Inc. and Wembley USA Inc. prior to 2002. He refused to answer. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 15, lines 15-24, attached hereto as **Exhibit B-34.**

61. During his deposition, Mr. Bucci was asked whether through his work with the Plaintiff Mr. Bucci also became familiar with Plaintiff's job duties at Lincoln Park and whether he had knowledge that Plaintiff performed financial functions on behalf of Lincoln Park, including reviewing and approving all money room controls, policies, and procedures. Mr. Bucci refused to answer. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 18, lines 1-23, attached hereto as **Exhibit B-34.** Mr. Bucci was asked whether he was aware that Plaintiff performed monthly reviews of financial statements on behalf of Lincoln Park, designed and set up automatic simulcast settlement programs, prepared business plans and budgets, and supervised all onsite accounting functions for Lincoln Park. He refused to answer. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 19, lines 1-24, p. 20, lines 1-14, attached hereto as **Exhibit B-34.**

62. Mr. Bucci was asked during his deposition whether he knew that Plaintiff assumed responsibility for the full financial affairs of Wembley USA Inc. on April 18, 2001, and that Plaintiff was considered to be within the cadre of upper management at both Wembley USA Inc. and Wembley Inc. at that time.

Mr. Bucci refused to answer. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 21, lines 7-17, p. 22, lines 3-22, attached hereto as **Exhibit B-34.** Mr. Bucci was also questioned with regards to his knowledge that Plaintiff attended board meetings of Wembley USA Inc. and/or Wembley Inc. Mr. Bucci refused to answer those questions as well. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 26, lines 16-24, attached hereto as **Exhibit B-34.**

63. Also during his deposition, Mr. Bucci was questioned with regards to whether during his employment with Defendants Wembley, he became familiar with Plaintiff's benefit and compensation packages and whether he was aware that, as of April 18, 2001, Plaintiff's benefit and compensation packages with Wembley USA Inc. and Wembley Inc. were not commensurate with comparable responsibility levels of other upper management members of Wembley USA Inc. or Wembley Inc. Mr. Bucci refused to answer. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 23, lines 20-24, p. 24, lines 1-7, attached hereto as **Exhibit B-34.**

64. Mr. Bucci was also asked whether he was aware that Plaintiff was the only female officer of Wembley USA Inc. or Wembley Inc. Mr. Bucci did not answer this question. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 15, lines 21-24, p. 16, 1-10, attached hereto as **Exhibit B-34.** Mr. Bucci was then asked whether he was aware that in October 2001, Defendants

Wembley hired a man, Jeffrey Goergen, as CFO even though his background, qualifications, and experience were less than that of Plaintiff. Again, Mr. Bucci did not answer. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 24, lines 8-24, attached hereto as **Exhibit B-34.**

65. Mr. Bucci was questioned with regards to whether he was aware that Plaintiff's check writing authority was reduced after filing her EEOC complaint in October 2001. Mr. Bucci chose not to answer this question. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 25, lines 20-24, p. 26, lines 1-5, attached hereto as **Exhibit B-34.** Mr. Bucci was also questioned during his deposition with regards to whether he was aware that after October 2001, Wembley USA Inc. and Wembley Inc. began for the first time to criticize Emerson's job performance, and excluded Plaintiff from all further board meetings. Again, Mr. Bucci did not answer. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 26, lines 6-15, p. 27, lines 2-12, attached hereto as **Exhibit B-34.** Finally, Mr. Bucci was asked whether Wembley USA inc. and Wembley Inc. removed Plaintiff's authority to approve all contracts and to approve purchases. Mr. Bucci did not answer. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 27, lines 13-23, attached hereto as **Exhibit B-34.**

66. Dan Bucci was recently convicted of conspiracy to commit wire fraud relating to his work while employed by Wembley. *See* documents relating to Bucci's

conviction, attached hereto as **Exhibit B-29;** Deposition of Dan Bucci, taken November 16, 2005, p. 8, lines 17-22, attached hereto as **Exhibit B-34.**

67. Plaintiff had knowledge of Mr. Bucci's illegal acts and attempted to stop them. *See* correspondence between Dan Bucci and Pat Emerson, attached hereto as **Exhibit B-28**; documents relating to questionable accounting practices, attached hereto as **Exhibit B-13**. During his deposition, Mr. Bucci was asked whether he was aware that Plaintiff refused to make payments to McKinnon and Harwood, and that these payments were what ultimately led to his indictment and conviction. Mr. Bucci did not answer the question. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 30, lines 4-15, attached hereto as **Exhibit B-34.**

68. Mr. Bucci was also asked whether he wanted Defendants Wembley to terminate Plaintiff when he realized that she knew about the McKinnon and Harwood payments. Mr. Bucci did not answer. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 31, lines 3-13, attached hereto as **Exhibit B-34.** During his deposition, Mr. Bucci was asked whether he discussed with Robert Ty Howard how to make Plaintiff's work environment so hostile that she would have no other choice but to leave employment with Wembley USA Inc. and Wembley Inc. Again, Mr. Bucci did not respond to the question. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 31, lines 14-24, attached hereto as **Exhibit B-34.**

69. Dan Bucci was asked whether he was aware that Plaintiff was called to testify in grand jury investigations that related to the criminal charges ultimately brought against him and Nigel Potter. He refused to answer. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 29, lines 18-24, p. 30, lines 1-3, attached hereto as **Exhibit B-34.** Mr. Bucci was also asked during his deposition whether he aware that after Plaintiff testified in the grand jury proceeding, she received her first written negative evaluation from Defendants Wembley. Mr. Bucci did not answer this question. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 29, lines 8-17, attached hereto as **Exhibit B-34.** Also during his deposition, Mr. Bucci was asked whether he knew that only after Plaintiff testified at the grand jury proceeding was she accused of fraud or threatened with termination. Mr. Bucci did not respond to the question. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 29, lines 8-24, attached hereto as **Exhibit B-34.**

70. Mr. Bucci was finally asked during his deposition whether he knew about the consequences that this hostile treatment by Defendants Wembley had on Plaintiff's health and whether he was aware that she experienced physical illness and emotional distress based upon the way she was treated in her employment. Mr. Bucci did not answer the question. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 37, lines 6-14, attached hereto as **Exhibit B-34.** Mr. Bucci was asked whether he knew that the Plaintiff's health

worsened to such a degree that she took a medical leave of absence from the company. Mr. Bucci refused to answer this question as well. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 37, lines 15-24, attached hereto as **Exhibit B-34.**

## II. Standard Of Review

In order to prevail on a Motion for Summary Judgment, the moving party must establish that no issues of material fact exist and that it is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). When a party seeks summary judgment, the court may only grant such relief "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding the motion, the court should "accept as true the evidence presented by the non-movant and draw all justifiable inferences in his favor." *Anderson*, 477 U.S. at 255.

Summary judgment is a drastic remedy and is never warranted except on a clear showing that there exists no genuine issue as to any material fact. *See Brawner-Ahlstrom v. Husson*, 969 P.2d 738 (Colo. App. 1998). Further, "summary judgment is appropriate only where the record, taken as a whole, could lead no rational trier of fact to find in ... favor [of the non-moving party] and would support judgment in favor of ... [the moving party] as a matter of law." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In the present case, issues of material fact preclude a granting of summary judgment. Further, Plaintiff can establish each element necessary to prevail on

the claims she asserts against Defendants Wembley. Therefore, Defendant Wembleys' Motion for Summary Judgment should be denied.

### III. The Plaintiff Was Constructively Discharged

"To prove a constructive discharge, a plaintiff must present sufficient evidence establishing deliberate action on the part of an employer which makes or allows an employee's working conditions to become so difficult or intolerable that the employee has no other choice but to resign." *Wilson v. Bd. of County Comm'rs*, 703 P.2d 1257, 1259 (Colo. 1985) (*citing Irving v. Dubuque Packing Co*., 689 F.2d 170 (10th Cir. 1982). A successful argument of constructive discharge "depends upon whether a reasonable person under the same or similar circumstances would view the …working conditions as intolerable." *Boulder Valley Sch. Dist. R-2 v. Price*, 805 P.2d 1085, 1088 (Colo. 1991). Cumulative events can also cause working conditions to deteriorate to an intolerable level. *See Hogue v. MQS Inspection*, 875 F.Supp. 714 (D.Colo. 1995). Because of the lengthy, hostile, demeaning actions of Defendants Wembley, as illustrated in Plaintiff's Undisputed Facts listed above, a reasonable person in the Plaintiff's position would view her conditions as intolerable. Therefore, Wembleys' Motion For Summary Judgment should be denied.

### IV. Plaintiff's Evidence Supports Her Breach Of Contract Claim

#### a. The Severance Agreement Is Triggered

The Plaintiff and Defendants Wembley entered into a severance agreement whereby Defendants Wembley agreed to pay Plaintiff one year's full pay in the event

Plaintiff was terminated ("Severance Agreement"). *See* Wembley Brief **Exhibit A-11**. Defendants Wembley have failed to perform under the Severance Agreement and are therefore in breach of this agreement.

Defendants Wembley argue that performance under the Severance Agreement was conditioned upon Defendants Wembleys' termination of the Plaintiff's employment. Defendants Wembley further argue that because Plaintiff resigned, the Severance Agreement is not triggered. *See* Wembley Brief, p. 9. Under the constructive discharge doctrine, however, an employee's reasonable decision to resign because of unendurable working conditions is equivalent to a formal discharge for remedial purposes. *See Pennsylvania State Police v. Suders*, 542 U.S.129 (2004) (*citing* B. Lidemann & P. Grossman, Employment Discrimination Law 838-839 (3d ed. 1996)). Because constructive discharge constitutes formal discharge, the Severance Agreement is triggered and Plaintiff is entitled to one year's severance pay. *See* Wembley Brief **Exhibit A-11**. Because Defendants Wembley have not paid Plaintiff severance pay, they are in breach of the Severance Agreement.

Defendants Wembley cite to *Alliance Metals, Inc. v. Hinely Indus., Inc.*, 222 F.3d 895, 902-903 (11th Cir. 2000) in support of their argument that constructive discharge does not constitute termination by the employer in the context of a breach of contract claim. *See* Wembley Brief, pages 10-11. In *Alliance Metals*, the 11th Circuit cites to *Turner v. Anheuser-Busch, Inc.*, 876 P.2d 1022, 1030 (Cal. 1994), in which the court stated "standing alone, constructive discharge is neither a tort nor a breach of contract, but a doctrine that transforms what is ostensibly a resignation into a firing." *Id.* Unlike the Severance Agreement in this case, the employment provision at issue in *Alliance*

*Metals* was a non-competition provision, requiring that the defendant not start, participate in, or assist any competitive enterprise for two years after his departure from Alliance. *See id.* at 902. The employment provision in *Alliance Metals* contained two narrow "escape clauses" included in paragraph 10(D). *See id.* One of the two escape clauses provided that the non-competition provision would become null and void, if after thirty days notice to Alliance and its lawyer, Alliance failed to cure a material breach of the employment contract. *See id.* The "terminat[ion] by Employer without cause" was the second escape clause the parties included in paragraph 10(D). *See id.* The *Alliance Metals* court did not consider the "by Employer" term in isolation. It concluded that the language "terminat[ion] by Employer without cause" manifested the intent to foreclose the sort of unintentional invalidation of the non-competition provision that could result from a constructive discharge. *See id.* Unlike the Severance Agreement at issue in this case, the type of employment provision at issue in *Alliance* is drastically different. Therefore, this Court should not rely on *Alliance Metals* in formulating its ruling with regards to Wembleys' Motion For Summary Judgment.

Wembley recognizes that no Colorado case has dealt with this exact issue. However, breach of an employment contract due to constructive discharge is recognized within the 10th Circuit. The U.S. District Court of Kansas has allowed such claims to proceed. *See Leopoldstadt, Inc. v. Fitzgerald*, No. 91-2419-GTV, 1992 WL 396330, at 5-6 (D. Kan. Dec. 22, 1992) (Kansas would recognize a cause of action for breach of an employment contract due to constructive discharge). This Court should likewise allow Plaintiff to proceed with her claim of breach of contract based upon Wembleys' refusal to pay Plaintiff's severance pay despite the fact that Plaintiff was constructively discharged.

**b. Plaintiff Was Also Given An Indemnification Agreement**

On April 12, 2001, Wembley plc sent to Plaintiff a letter indicating that the company would indemnify her for any sensitive information she provided Wembley with respect to certain questionable expenditures ("Indemnification Agreement"). *See* letter from Wembley plc and WUSA to Pat Emerson, attached hereto as **Exhibit B-12**. After receiving the Indemnification Agreement, Plaintiff informed Wembley of certain actions taken by Wembley USA, Inc. CEO and CFO, Skip Sherman and David Brents. *See* affidavit of Pat Emerson, attached hereto as **Exhibit B-8**. Although Plaintiff was provided an Indemnification Agreement, Plaintiff was harassed and constructively discharged because she provided such information to Wembley. *See* affidavit of Pat Emerson, attached hereto as **Exhibit B-8**.

An indemnification agreement, such as the one in this case, is generally governed by the same rules of construction and interpretation that govern contracts. *See May Dep't Stores Co. v. Univ. Hills, Inc.*, 824 P.2d 100 (Colo. App. 1991). In the instant case, the Indemnification Agreement provides that Wembley plc and WUSA will indemnify Plaintiff if Plaintiff provides Wembley with certain information. The Indemnification Agreement, therefore, was triggered when Plaintiff provided information to Wembley. Plaintiff did provide information to Wembley. *See* affidavit of Pat Emerson, attached hereto as **Exhibit B-8**. In accordance with the Indemnification Agreement, Wembley should indemnify Plaintiff for the damages she incurred as a result of her constructive discharge from the company. Because Wembley has failed to do so, Wembley is in

breach of the Indemnification Agreement. *See* affidavit of Pat Emerson, attached hereto as **Exhibit B-8**.

V. **WINC Is Plaintiff's Employer**

**a. Wembley Was Reorganized After Plaintiff's Employment Ceased**

While Plaintiff was employed by Wembley, WINC wholly-owned WUSA. *See* organization charts, attached hereto as **Exhibit B-28**; affidavit of Pat Emerson, attached hereto as **Exhibit B-8**. WUSA in turn wholly-owned Lincoln Park. *See* organization charts, attached hereto as **Exhibit B-28**; affidavit of Pat Emerson, attached hereto as **Exhibit B-8**. After Plaintiff's employment with Wembley ceased, Wembley was reorganized. Now, WINC wholly owns Lincoln Park. *See* organization charts, attached hereto as **Exhibit B-28**; affidavit of Pat Emerson, attached hereto as **Exhibit B-8**. WUSA no longer maintains the same assets, structure, or responsibilities it did during the time Plaintiff was employed by Wembley. *See* organization charts, attached hereto as **Exhibit B-28**; affidavit of Pat Emerson, attached hereto as **Exhibit B-8**. Instead, those assets and responsibilities are now divided between WINC and WUSA. *See* organization charts, attached hereto as **Exhibit B-28**; affidavit of Pat Emerson, attached hereto as **Exhibit B-8**.

Although the undersigned could not locate any Colorado state or federal cases on this point, it follows logic that where a company has reorganized, the Plaintiff should have standing to assert claims against any company resembling the companies for which she once worked. Therefore, both WINC and WUSA were appropriately named as defendants to this action.

**b. WINC And WUSA Are A Single Entity Under Title VII**

Defendants Wembley argue that Plaintiff's Title VII claim against WINC fails because WINC does not employ the requisite fifteen (15) employees to be subject to Title VII. *See* Wembley Brief, page 14. However, Plaintiff is entitled to Title VII relief if Defendants Wembley could be considered a single or joint employer under 42 U.S.C. § 2000e(b). *See Mckenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930 (11th Cir. 1987). The predominant trend in determining whether two businesses should be treated as a single or joint employer under § 2000e(b) is to apply the standards promulgated by the National Labor Relations Board ("NLRB"). *See Equal Employment Opportunity Comm'n v. Wooster Bruch Co. Employees Relief Ass'n*, 727 F.2d 566, 572 (6th Cir. 1984); *Childs v. Local 18, Int'l Bhd. of Elec. Workers*, 719 F.2d 1379, 1382 (9th Cir. 1983); *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir. 1983); *Mas Marques v. Digital Equip. Corp.*, 637 F.2d 24, 27 (1st Cir. 1980). The NLRB factors include: (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control.

In this case, WUSA aids in WINC's primary function to file tax returns on behalf of its subsidiaries. Furthermore, WUSA and WINC share the same officers. *See* Undisputed Facts above. WUSA is also owned by WINC. *See* Undisputed Facts above. Defendant Howard has testified that WINC and WUSA have loaned or borrowed money from each other. *See* Undisputed Facts above. Furthermore, The Plaintiff performed tax planning and preparation, consolidation and budgeting activities for WINC thus assisting in WINC's primary function, even though she is an employee of WUSA. *See* Undisputed

Facts above. The evidence presented raises a genuine issue of material fact as to whether WUSA and WINC are a joint employer under 42 U.S.C. § 2000e(b). As such, summary judgment is precluded.

**c. WINC Is Plaintiff's Employer Under Common Law Agency**

Defendants Wembley also argue that WINC does not qualify as the Plaintiff's employer as to the Plaintiff's other claims under common law principles. *See* Wembley Brief, page 15. However, a liberal construction must be accorded to the term employer. *See Trevino v. Celanese Corp.*, 701 F.2d 397, 403 (5th Cir. 1983); *Baker v. Stuart Broadcasting Co.*, 560 F.2d 389, 391 (8th Cir. 1977). Therefore, this Court should construe such interpretation broadly.

The existence of an agency relationship is ordinarily a question of fact to be determined by the fact finder. *See Moses v. Diocese of Colo.*, 863 P.2d 310, 324 (Colo. 1993). A court can only decide whether an agency relationship exists as matter of law when the facts are not in dispute. *See id.* As discussed below, facts regarding Plaintiff's relationship with WINC are in dispute. Therefore, this issue is not properly decided upon motion for summary judgment.

Agency is ultimately a question of the intention of the parties and is evidenced by their acts and not on what the relationship is called. *See Granite State Fire Ins. Co. v. Mitton*, 98 F.Supp. 706 (D. Colo. 1951), *aff'd* 196 F.2d 988 (10th Cir. 1952). Thus, formal terminology regarding the relationship between the Plaintiff and WINC is not necessary. In determining whether a hired party is an employee under the general common law of agency, courts evaluate all factors relevant to the to the hiring party's

right to control the manner and means by which the work is accomplished. *See Hockett v. Sun* Co., *Inc. (R&M)*, 109 F.3d 1515, 1526 (10th Cir. 1997). These factors include: (a) the skill required in the particular occupation; (b) the source of the instrumentalities and tools for the person doing the work; (c) the location of the work; (d) the duration of the work relationship; (e) the hiring party's right to assign additional projects to the hired party; (f) the hired party's discretion over when and how long to work; (g) the method of payment, whether by the time or by the job; (h) the hired party's role in hiring and paying assistants; (i) whether the work is party of the regular business of the hiring party; (j) whether the hiring party is or is not in business; (k) the provision of employee benefits; (l) tax treatment of the hired party. *See id.* No single factor is dispositive. *See id.* "A court may also consider the intent of the parties and their beliefs as to whether they have created the relation of employer and employee." *Roth v. Amer. Hosp. Supply Corp.*, 965 F.2d 862, 865 (10th Cir. 1992); *Hockett*, 109 F.3d at 1526.

As Defendants Wembley state, WINC's primary function is to file tax returns on behalf of its subsidiaries. *See* ¶2 Wembley Brief. It is undisputed that Plaintiff prepared the tax returns on behalf of WINC. *See* Undisputed Facts above. Therefore, the work performed by Plaintiff was part of WINC's regular business. Furthermore, Plaintiff has testified that because WUSA and WINC share the exact same directors and officers, Plaintiff did not know whether she was reporting to WUSA or WINC when conducting her work. *See* Deposition transcript of Pat Emerson, dated April 28, 2004, p. 105, lines 6-14, Wembley Brief **Exhibit A-1**. However, Plaintiff believes she received instructions from WINC pertaining to tax audit and tax preparation. *See* Deposition transcript of Pat Emerson, dated April 28, 2004, p. 106, lines 5-15, Wembley Brief **Exhibit A-1**. Plaintiff

also had contact with WINC with respect to her grand jury testimony. *See* Deposition transcript of Pat Emerson, dated April 28, 2004, p. 106, lines 21-23, Wembley Brief **Exhibit A-1**.

Plaintiff can demonstrate that a disputed issue exists with regards to whether WUSA and WINC acted as one entity. This issue, therefore, should be properly preserved for a jury. If the jury determines that WUSA and WINC are the same entity and that WINC was Plaintiff's employer, Plaintiff should prevail on her claims against WINC. At this time, Wembleys' Motion For Summary Judgment should be denied.

## VI. Defendants Wembleys' Outrageous Conduct Caused The Plaintiff Severe Emotional Distress

F.R.C.P. 56 allows the court to consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." Therefore, contrary to Defendants Wembleys' contention, this Court must consider all evidence, not solely the Complaint. As illustrated, Defendants Wembleys' continued callous conduct caused the Plaintiff severe emotional distress. This conduct can be offered to prove Plaintiff's Title VII claims. Any evidence above that required to prevail on Plaintiff's Title VII claim may be used to establish Defendants Wembleys' outrageous conduct.

The question of whether certain conduct rises to the level of outrageousness is ordinarily a question of fact for the trier of fact. *See Cassidy v. Millers Cas. Ins. Co. of Texas*, 1 F.Supp.2d 1200, 1213 (D. Colo. 1998). However, the court must first determine whether reasonable persons could differ on the outrageousness issue. *See id. citing Simmons v. Prudential Ins. Co. of Amer.*, 641 F.Supp. 675, 683 (D. Colo. 1986). In *Rawson v. Sears Roebuck & Co.*, 530 F.Supp. 776, 780 (D. Colo. 1982), *rev'd on other*

*grounds*, 822 F.2d 908 (10th Cir. 1987), Judge Kane determined that a plaintiff must establish a certain minimum threshold level of conduct to state a cause of action for outrageous conduct. *See Cassidy, supra,* at 1213. To meet this threshold, the plaintiff must allege either that (1) defendant has engaged in a pattern of conduct that was intended to cause or recklessly did cause severe emotional distress; or (2) if the incident is isolated, defendant blatantly and severely harassed plaintiff. *See Rawson*, 530 F.Supp. at 780; *accord Brezinski v. F.W. Woolworth Co.*, 626 F.Supp.240, 244 (D. Colo. 1986).

Defendants Wembley engaged in a pattern of conduct that was intended to cause or recklessly did cause severe emotional distress. Plaintiff communicated her physical illness that resulted from Defendant Wembleys' severe emotional distress. Plaintiff also sought treatment for her emotional distress from her treating doctors. *See* Undisputed Facts above; documents relating to Plaintiff's physical health, attached hereto as **Exhibit B-23**. Plaintiff's resulting emotional symptoms reflect the outrageousness of Defendant Wembleys' conduct. Plaintiff has made a sufficient showing to pass the threshold test outlined in *Cassidy, supra* and Wembleys' Motion For Summary Judgment should be denied.

## VII. Defendants Wembley Wrongful Discharged The Plaintiff In Violation Of Public Policy

The elements of a wrongful discharge claim are: (1) the employer directed the employee to perform and illegal act as part of the employee's duties; (2) the action directed by the employer would violate a statute or clearly expressed public policy; (3) the employee was terminated as a result of refusing to perform the illegal act; and (4) the employer was aware or should have been aware that the employee's refusal was based

upon the employee's reasonable belief that the act was illegal. *See Martin Marietta v. Lorenz*, 823 P.2d 100, 109 (Colo. 1992). This judicially crafted exception to at-will employment restricts an employer's right to terminate the employee's employment when the termination contravenes accepted and substantial public policies such as those embodied by legislative declarations, *professional codes of ethics*, or other sources. *See Wisehart v. Meganck*, 66 P.3d 124, 127 (Colo. App. 2002) *cert. denied* (emphasis added).

In this case, Plaintiff, a licensed C.P.A., performed tax and accounting responsibilities for Defendants Wembley. *See* Wembley Brief. Plaintiff discovered and complained to Defendants Wembley about questionable accounting practices such as the payments made to Mr. Sherman's step-daughter for work never performed by the step-daughter (*see* Undisputed Facts above; documents relating to questionable accounting practices, attached hereto as **Exhibit B-13**); whether certain property should be sold below market value (*see* documents relating to questionable accounting practices, attached hereto as **Exhibit B-13**); and payments made to an employee's daughter's British Primary School in the amount of $10,000.00 (*see* documents relating to questionable accounting practices, attached hereto as **Exhibit B-13**). In January of 2001, Plaintiff specifically stated that no checks were to be made to the law firm of McKinnon and Harwood because she suspected that Wembley was bribing them in order to gain advantage in gaming industry. *See* documents relating to McKinnon and Harwood, attached as **Exhibit B-10**. Throughout the month of July of 2001, Plaintiff authored e-mails regarding her concerns of additional questionable accounting practices, including internal controls and checks being cashed through the money room. *See* documents relating to questionable accounting practices, attached hereto as **Exhibit B-13**. The

Plaintiff communicated her obligations to Defendants Wembley by stating "I am held to [ethical standards] as a Certified Public Accountant and the possibility that I could lose my license by remaining silent." *See* documents relating to questionable accounting practices, attached hereto as **Exhibit B-13**. These questionable accounting practices were detailed to her supervisors. *See* documents relating to questionable accounting practices, attached hereto as **Exhibit B-13**.

In *Rocky Mountain Hosp. and Medical Serv. v. Mariani*, 916 P.2d 519, 523 (Colo. 1996), the court held that the Colorado State Board of Accountancy Rules and Regulations may constitute public policy for purposes of establishing a wrongful discharge claim in violation of public policy. *See id.* These rules specifically direct an accountant to refrain from knowingly misrepresenting facts. *Id.* at 526.

As aforementioned, the Plaintiff was constructively discharged. Although Colorado state courts have not yet determined whether constructive discharge is sufficient to prevail on a claim of wrongful discharge in violation of public policy, the absence of such a determination does not render Plaintiff's claim null. In fact, the Supreme Court of Oklahoma in *Collier*, when analyzing Oklahoma's public policy exception to at-will employment, found that a retaliatory constructive discharge may serve as a predicate in bringing a public policy claim. *See Collier v. Insignia Financial Group*, 981 P.2d 321, 324 (Okl. 1999). In this case, Plaintiff has demonstrated that she was constructively discharged because she questioned Defendants Wembley regarding several questionable accounting practices. Therefore, Wembleys' Motion For Summary Judgment should be denied.

## VIII. The Plaintiff's Evidence Satisfies The Requirements of C.R.S § 8-2.5-101

Defendants Wembley argue that Plaintiff cannot prevail on her claim of violation of C.R.S. § 8-2.5-101 because the statute only precludes Defendants Wembleys' discriminatory practices relating to Plaintiff's testimony where those discriminatory practices are the sole result of Plaintiff's testimony. *See* Wembley Brief, pp. 24-29. On its face, this argument fails logic. It does not follow that an employer acts lawfully if it discriminates against its employees for a number of different reasons, but acts unlawfully if it discriminates against its employees for only one reason.

The term "solely" as used in the statute refers to the employee's actions, not the employer's reasons for discriminating against the employee. That is, if the employer has no valid, lawful reason to treat the employee negatively and the only reason that the employer treats the employee negatively is because of the employee's testimony, the employer violates the statute. This court should not adopt an interpretation that would encourage employers to discriminate, harass, and retaliate for a multitude of reasons where this court can adopt an interpretation that would discourage employers from discriminating, harassing, and retaliating altogether.

Nevertheless and as previously discussed, Plaintiff can show that she was discriminated against solely for her testimony during the Rhode Island grand jury proceedings. Plaintiff received her first negative evaluation; Defendant Goergen criticized the Plaintiff's job performance; Plaintiff was falsely accused of fraud; and Plaintiff was repeatedly threatened with termination *immediately* following her grand jury testimony. *See* Deposition transcript of Pat Emerson, dated April 28, 2004, p. 6, lines 15-17, attached hereto as **Exhibit B-1**, and undisputed facts listed above. This sequence of

events following Plaintiff's testimony illustrates Defendants Wembleys' retaliation as a direct result of Plaintiff's testimony. Therefore, Defendants Wembleys' Motion For Summary Judgment should be denied.

## IX. Plaintiff Is Entitled To An Adverse Inference Against Defendants Wembley In Response To Mr. Bucci's Invocation Of His Fifth Amendment Rights During His Deposition.

Plaintiff completed the deposition of Mr. Daniel Bucci on November 16, 2005 in Providence, Rhode Island. Dan Bucci was an officer and director of Wembley who regularly worked with the Plaintiff at all times pertinent to this matter. *See* documents relating to Wembleys' officers and subsidiaries, attached hereto as **Exhibit B-6;** correspondence between Dan Bucci and Pat Emerson, attached hereto as **Exhibit B-28**. Mr. Bucci has recently been convicted of conspiracy to commit wire fraud and is preparing to appeal (the "Lincoln Part appeal"). *See* Undisputed Facts above. Accordingly, Mr. Bucci declined to answer the vast majority of the deposition questions posed in the present case. Instead, Mr. Bucci asserted his Fifth Amendment rights under the United States Constitution. *See* Deposition of Dan Bucci, taken November 16, 2005, attached hereto as **Exhibit B-34.** Because of Mr. Bucci's silence, Plaintiff was deprived of vital and important discovery in this case.

Mr. Bucci was a representative of Defendants Wembley because he worked at Wembley at all times pertinent herein. Dan Bucci was an officer and director of Wembley USA Inc. and Wembley Inc. at the time Plaintiff worked for the companies. *See* documents relating to Wembleys' officers and subsidiaries, attached hereto as **Exhibit B-6**; Deposition of Dan Bucci, taken November 16, 2005, p. 10, lines 18-24, p.

11, lines 1-7, attached hereto as **Exhibit B-34.** Mr. Bucci also worked for Lincoln Park at the time Plaintiff worked for Defendants Wembley. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 12, lines 12-18, attached hereto as **Exhibit B-34.** Wembley Inc now owns Lincoln Park. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 33, lines 22-24, p. 34, lines 1-4, attached hereto as **Exhibit B-34.** While working for Wembley USA Inc. and Wembley Inc., Mr. Bucci reported to Nigel Potter. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 11, lines 19-24, p. 23, lines 2-3, attached hereto as **Exhibit B-34.** Mr. Bucci also reported to Mr. Potter while working at Lincoln Park. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 12, lines 19-24, p. 13, lines 1-4, attached hereto as **Exhibit B-34.**

That Mr. Bucci represented Defendants Wembley is evident from Mr. Bucci's job duties and conduct during the course of the Plaintiff's employment. Dan Bucci was familiar with the accounting practices at Lincoln Park, and with how the money room was operated. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 13, lines 5-24, attached hereto as **Exhibit B-34.** Mr. Bucci wrote and cashed checks in the money room in Lincoln Park. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 47, lines 9-20, attached hereto as **Exhibit B-34.** Mr. Bucci also helped prepare the job requirements for the financial director position at Lincoln Park. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 49, lines 5-15, attached hereto as **Exhibit B-34.** Mr. Bucci had a role in reducing Plaintiff's status as a type A check signer after April 27, 2001. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 39, lines 2-11, attached hereto as **Exhibit B-34.** Mr. Bucci exchanged emails and messages on Lincoln Park letterhead discussing the Plaintiff. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 53-

56, attached hereto as **Exhibit B-34.** Further, Mr. Bucci sent a memo to Plaintiff telling her that any requests for corporate information must come through Mr. Bucci in writing. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 48, lines 7-15, attached hereto as **Exhibit B-34.** Mr. Bucci is clearly an agent and employee of Defendants Wembley.

Therefore, the Plaintiff respectfully requests this Court order an adverse inference against Defendants Wembley for each of the unanswered questions in Mr. Bucci's deposition, in order to preserve fairness and justice in this case.

An adverse inference is proper in a civil matter. *See Asplin v. Mueller*, 687 P.2d 1329 (Colo. App. 1984). In *Baxter v. Palmigiano*, the U.S. Supreme Court held that the Fifth Amendment does not preclude a court from drawing negative inferences against a party in a civil action who refuses "to testify in response to probative evidence offered against [him]." *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). Likewise, in *Chaffrin, Inc. v. Wallain*, the Colorado Court of Appeals allowed an adverse inference against a party in a civil case who claimed the Fifth Amendment "in response to discovery requests and to properly posed questions." *See Chaffin, Inc. v. Wallain*, 689 P.2d 684 (Colo. App. 1984).

Courts have found that allowing the fact finder to draw an adverse inference from one party's silence substantially levels the playing field for the opposing party. *See S.E.C. v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998). In determining whether to draw an adverse inference, "[a] trial court must carefully balance the interests of the party claiming protection against self-incrimination and the adversary's entitlement to equitable treatment." *Wehling v. Columbia Broadcasting Sys.*, 608 F.2d 1084 (5th Cir. 1979)

(*quoting SEC v. Graystone Nash, Inc.*, 25 F.3d 187, 192 (3d Cir. 1994)). Although the privilege against self-incrimination exemplifies important policy considerations, courts must also recognize the realities of modern litigation. *See Chaffin*, 689 P.2d at 688. "In civil actions, the vast weight of the government's investigative and prosecutorial resources are not present." *Id.* "[T]he ability of a party in a civil action to litigate a claim can be severely hampered if, as here, his requests for discovery and questions to a witness are met with the litany of a Fifth Amendment claim of privilege." *Id.* at 688-689.

In addition, an adverse inference is a remedy within the discretion of this Court. "A trial court retains significant discretion in fashioning the appropriate remedy for a plaintiff's refusal to answer specific questions based on the privilege against self-incrimination." *See Steiner, M.D. v. Minn. Life Ins. Co.*, 85 P.3d 135 (Colo. 2004).

In determining what adverse consequences will flow from a party's invocation of his Fifth Amendment privilege in response to deposition questions, the Colorado Court of Appeals has applied a fairness standard. *See Steiner, supra.* at 141. In *Steiner*, the Court held that "when confronted with the tension between the plaintiff's invocation of the privilege and the defendant's need for discovery, a trial court must determine: (1) whether the defendant has a substantial need for the information withheld; (2) whether the defendant has an alternative means of obtaining the information; and (3) whether any effective, alternative remedy, short of dismissal, is available." *See id.* The court recognized that the appropriate remedy depends upon the facts and circumstances of each case. *See id.*

In the present case, drawing an adverse inference against Mr. Bucci's testimony, and applying it to every unanswered question, would help remedy the unfair prejudice

experienced by the Plaintiff as a result of Mr. Bucci's silence during his deposition. Plaintiff anticipated gathering significant and vital information during Mr. Bucci's deposition, as indicated by the questions Plaintiff asked Mr. Bucci. *See* Deposition of Dan Bucci, taken November 16, 2005, attached hereto as **Exhibit B-34;** affidavit of Pat Emerson, attached hereto as **Exhibit B-8**.

Mr. Bucci would have testified at his deposition regarding the structural organization of Wembley USA Inc. and Wembley Inc. Mr. Bucci was asked whether Wembley USA Inc. and Wembley Inc. had the same registered agents in Colorado and Delaware. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 32, lines 1-8, attached hereto as **Exhibit B-34.** Dan Bucci was also asked whether, at the time of the Plaintiff's employment, all of Wembley Inc.'s officers and directors were the same as Wembley USA Inc.'s officers and directors. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 32, lines 9-16, attached hereto as **Exhibit B-34.**

Mr. Bucci's would have further testified as to the reorganization of Wembley USA Inc., Wembley Inc., and Lincoln Park. Mr. Bucci was asked whether he was aware that after Plaintiff's employment with Defendants Wembley, the Wembley companies were reorganized. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 33, lines 4-11, attached hereto as **Exhibit B-34.** Mr. Bucci was asked to confirm that the assets and responsibilities once held by Wembley USA Inc. are now divided between Wembley Inc. and Wembley USA Inc. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 32, lines 17-24, p. 33, lines 1-3, attached hereto as **Exhibit B-34.** Mr. Bucci was asked whether Wembley Inc now owns Lincoln Park. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 33, lines 22-24, p. 34, lines 1-4, attached hereto as **Exhibit B-34.**

Mr. Bucci's testimony would have confirmed that Wembley Inc. now most closely resembles the entities for which Plaintiff performed work during her employment. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 33, lines 12-21, attached hereto as **Exhibit B-34.**

Mr. Bucci would have testified regarding the dates of Plaintiff's employment and her scope of work while employed at Wembley Inc., Wembley USA Inc., and Lincoln Park. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 15, lines 5-20, attached hereto as **Exhibit B-34.** Mr. Bucci was asked whether he was aware that Plaintiff prepared federal tax returns for Wembley Inc. and signed these returns as acting CFO. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 16, lines 11-21, p. 17, 1-14, attached hereto as **Exhibit B-34.** Mr. Bucci was also asked whether he was aware that Plaintiff had authority to approve all contracts and purchases for Wembley Inc. and Wembley USA Inc. prior to 2002. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 15, lines 15-24, attached hereto as **Exhibit B-34.**

In addition, Mr. Bucci was asked whether Plaintiff performed financial functions on behalf of Lincoln Park to include reviewing and approving all money room controls, policies, and procedures; performing monthly reviews of financial statements; designing and setting up automatic simulcast settlement programs; preparing business plans and budgets; and supervising all onsite accounting functions for Lincoln Park. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 18, lines 1-23, p. 19, lines 1-24, p. 20, lines 1-14, attached hereto as **Exhibit B-34.**

Dan Bucci would have testified regarding whether Plaintiff was considered to be within the cadre of upper management at both Wembley USA Inc. and Wembley Inc. at

the time of her employment. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 22, lines 3-22, attached hereto as **Exhibit B-34.** Mr. Bucci was asked whether Plaintiff attended board meetings for Wembley USA Inc. and Wembley Inc. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 26, lines 16-24, attached hereto as **Exhibit B-34.** Mr. Bucci was further asked whether the Plaintiff assumed responsibility for the full financial affairs of Wembley USA Inc. on April 18, 2001. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 21, lines 7-17, attached hereto as **Exhibit B-34.**

Mr. Bucci's deposition testimony would have included statements supporting the Plaintiff's claim of gender discrimination. Mr. Bucci was asked whether he was familiar with Plaintiff's benefit and compensation packages. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 23, lines 11-19, attached hereto as **Exhibit B-34.** Mr. Bucci was asked whether, as of April 18, 2001, Plaintiff's benefit and compensation packages with Wembley USA Inc. and Wembley Inc. were not commensurate with comparable responsibility levels of other upper management members of Wembley USA Inc. or Wembley Inc. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 23, lines 20-24, p. 24, lines 1-7, attached hereto as **Exhibit B-34.** Mr. Bucci was also asked whether Plaintiff was the only female officer of Wembley USA Inc. or Wembley Inc. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 15, lines 21-24, p. 16, 1-10, attached hereto as **Exhibit B-34.** Mr. Bucci was asked whether, in October 2001, Defendants Wembley hired Jeffrey Goergen as CFO, even though Mr. Goergen's background, qualifications, and experience were less than that of Plaintiff. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 24, lines 8-24, attached hereto as **Exhibit B-34.**

Mr. Bucci would have testified as to the consequences of Plaintiff's filing her EEOC complaint in October 2001. Mr. Bucci was asked whether he reduced Plaintiff's status as a type A check signer after April 27, 2001. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 25, lines 20-24, p. 26, lines 1-5, p. 39, lines 2-11, attached hereto as **Exhibit B-34.** Mr. Bucci was asked whether he was aware that after October 2001, Wembley USA Inc. and Wembley Inc. began for the first time to criticize Emerson's job performance, and excluded Plaintiff from all further board meetings. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 26, lines 6-15, p. 27, lines 2-12, attached hereto as **Exhibit B-34.** Mr. Bucci was further asked whether Wembley USA inc. and Wembley Inc. removed Plaintiff's authority to approve all contracts and to approve purchases. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 27, lines 13-23, attached hereto as **Exhibit B-34.**

Mr. Bucci would have also testified as to the Plaintiff's role in the grand jury proceedings against Mr. Bucci. Mr. Bucci was asked whether the Plaintiff was called to testify in grand jury investigations that related to the criminal charges ultimately brought against Mr. Bucci and Nigel Potter. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 29, lines 18-24, p. 30, lines 1-3, attached hereto as **Exhibit B-34.** Mr. Bucci was asked to admit that Plaintiff refused to make payments to McKinnon and Harwood, and that these payments were what ultimately what led to Mr. Bucci's indictment and conviction. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 30, lines 4-15, attached hereto as **Exhibit B-34.**

Mr. Bucci would have further testified as to the consequences of the Plaintiff's grand jury testimony. Mr. Bucci was asked whether he requested that Defendants

Wembley terminate Plaintiff when he realized that Plaintiff knew about the McKinnon and Harwood payments. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 31, lines 3-13, attached hereto as **Exhibit B-34.** Mr. Bucci was also asked whether he discussed with Robert Ty Howard how to make Plaintiff's work environment so hostile that she would have no other choice but to leave employment with Wembley USA Inc. and Wembley Inc. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 31, lines 14-24, attached hereto as **Exhibit B-34.** In addition, Mr. Bucci was asked to admit he sent emails to Mr. Goergen calling the Plaintiff "nosey" [sic] and a "professional rat." *See* Deposition of Dan Bucci, taken November 16, 2005, p. 53, lines 16-23, p. 54, lines 1-13, p. 55, lines 10-24, p. 56, lines 1-11, attached hereto as **Exhibit B-34.**

Mr. Bucci was asked to admit that he sent a memo to the Plaintiff telling her that any requests for corporate information must come through him in writing. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 48, lines 7-15, attached hereto as **Exhibit B-34.** Mr. Bucci was also asked whether he prepared the job requirements for the financial director position at Lincoln Park to which Plaintiff applied, and whether the Plaintiff possessed all of the requirements for this job. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 49, lines 16-24, attached hereto as **Exhibit B-34.**

Mr. Bucci was asked whether he was aware that, after Plaintiff testified in the grand jury proceeding, she received her first written negative evaluation from Defendants Wembley. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 29, lines 8-17, attached hereto as **Exhibit B-34.** Mr. Bucci would have testified that that only after Plaintiff testified at the grand jury proceeding was she accused of fraud or threatened

with termination. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 29, lines 8-24, attached hereto as **Exhibit B-34.**

In addition, Mr. Bucci would have testified regarding his awareness of the effects of this discrimination and retaliation upon the Plaintiff. Mr. Bucci was asked whether he was aware that the Plaintiff experienced physical illness and emotional distress based upon the way she was treated in her employment. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 37, lines 6-14, attached hereto as **Exhibit B-34.** Mr. Bucci was asked whether the Plaintiff's health worsened to such a degree that she had to take a medical leave of absence from the company. *See* Deposition of Dan Bucci, taken November 16, 2005, p. 37, lines 15-24, attached hereto as **Exhibit B-34.**

Because Mr. Bucci pled the Fifth Amendment during his deposition, Plaintiff has been foreclosed from using the vital testimony indicated above to support her claim. Mr. Bucci's claim of privilege has thus created an uneven playing field that severely prejudices the Plaintiff's ability to plead her case. The purpose of the discovery process is to ensure fairness for all parties involved. The Colorado Rules of Civil Procedure governing discovery were written in order to "eliminate secrets and surprises at trial, simplify issues, and lead to fair and just settlements without having to go to trial." *Crist v. Goody*, 507 P.2d 478, 499 (Colo. App. 1972); CRCP 16, 26; FRC 16, 26.

Once an adverse inference is drawn, the court is free to use that evidence to rule on a summary judgment or subsequent motion. *See Sec. & Exchange Comm'n v. Martino*, 255 F.Supp.2d 268, 288 (S.D.N.Y. 2003) (An adverse inference taken from the defendant's deposition led to the court's conclusion that the plaintiff was entitled to summary judgment).

Accordingly, the Plaintiff respectfully requests this Court draw an adverse inference against the Defendant Wembly with respect to each unanswered question in Mr. Bucci's deposition, for use as evidence when deciding Wembley Inc.'s Second Renewed Motion For Summary Judgment and Wembley USA Inc.'s Second Renewed Motion for Partial Summary Judgment, as well as on any subsequent motions. Plaintiff requests that this Court deem that Mr. Bucci admitted each unanswered question in his testimony. Mr. Bucci was an employee and agent of Defendants Wembley at all times pertinent herein. An adverse inference against the Defendants Wembley for each unanswered question is within this Court's discretion, and is an appropriate remedy that would preserve fairness in this case. The Plaintiff's request is supported by the burden of proof on a motion for summary judgment. In deciding upon a motion for summary judgment, the court should "accept as true the evidence presented by the non-movant and draw all justifiable inferences in his favor." *Anderson*, 477 U.S. at 255.

The evidence indicates that there is a genuine issue of material fact with respect to multiple issues in this present case. Therefore, Wembley Inc.'s Second Renewed Motion For Summary Judgment and Wembley USA Inc.'s Second Renewed Motion for Partial Summary Judgment should be DENIED.

**WHEREFORE**, and based on the foregoing, Plaintiff respectfully requests this Court to deny Wembley Inc.'s Second Renewed Motion For Summary Judgment and Wembley USA Inc.'s Second Renewed Motion for Partial Summary Judgment and to grant an adverse inference against Defendants Wembley for each question Mr. Bucci declined to answer during his deposition.

Respectfully submitted this 22nd day of December, 2005.

**ZUPKUS & ANGELL, P.C.**

**s/ Melissa A. clack**
Robert Zupkus
Bradley N. Shefrin
Melissa A. Clack
Zupkus & Angell, P.C.
555 E. 8th Avenue
Denver, Colorado 80202
Telephone: (303) 894-8948
Fax: (303) 894-0104
Email: rzupkus@zalaw.com
Email: bshefrin@zalaw.com
Email: mclack@zalaw.com
Attorneys for Plaintiff Patricia Emerson

**CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of December 2005, I electronically filed the foregoing **Response To Wembley Inc.'s Second Renewed Motion For Summary Judgment And Wembley USA, Inc.'s Second Renewed Motion For Partial Summary Judgment**, with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

kmix@swlaw.com
Kristen L. Mix, Esq.
Snell & Wilmer
1200 Seventeenth Street, Suite 1900
The Tabor Center
Denver, CO 80202

**s/Jessica J. Meier**
**FOR ZUPKUS & ANGELL, P.C.**